| | |
|---|---|
| NORBERTO MARTINEZ, JR.,<br> Plaintiff, | No. 3:17-cv-843 (SRU) |
| v. | |
| NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br> Defendant. | |

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Norberto Martinez, Jr. ("Martinez") moves to reverse the decision by the Social Security Administration ("SSA") denying him disability insurance benefits. Mot. to Reverse, Doc. No. 23. The Commissioner of Social Security ("Commissioner") moves to affirm the decision. Mot. to Affirm, Doc. No. 24. Although I conclude that most of Martinez's arguments for reversal lack merit, I hold that the ALJ's determinations at step three and step five were deficient and, therefore, remand is warranted. Accordingly, Martinez's Motion to Reverse the Decision of the Commissioner (Doc. No. 23) is **granted**, and the Commissioner's Motion to Affirm its Decision (Doc. No. 24) is **denied**.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id*. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, the court conducts a "plenary review" of the administrative record but does not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). The court may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts

Martinez filed for Social Security benefits and supplemental security income on March 7, 2013. Applications for Benefits, Ex. 1B, R. at 148; Ex. 2B, R. at 155. In his applications, Martinez alleged a period of disability beginning April 1, 2006. *Id.* Martinez later amended the alleged onset date to October 16, 2011. Rep. Brief, Ex. 16E, R. at 360. Martinez alleged in his application that he suffered from "[l]umbar discus [and] bipolar" disorder. Int'l Disability Determination Explanations, Ex. 3A, R. at 94; Ex. 4A, R. at 105.

### A.   Medical History

Martinez's medical records begin with a series of charts from the Connecticut Department of Correction ("DOC") from January 30, 1997 to August of 2008. DOC Med. Rec.,

Ex. 23F-24F, R. at 1025-1145. In 1999, Martinez was diagnosed with depression and post-traumatic stress disorder, for which he was prescribed Seroquel and Risperdal, as well as polysubstance abuse and major depression with psychosis. *Id*. at 1036-37. Martinez noted that he used heroin and alcohol while out of prison and went through multiple unsuccessful substance abuse programs. *Id*. at 1048.

Treatment notes from St. Vincent's Medical Center ("St. Vincent's") from May 19, 2009 reflect that Martinez sustained a three-inch-deep gash to his right hand while "cutting kitchen laminate during construction." St. Vincent's Med. Rec., Ex. 16F, R. at 863. The wound was cleaned and sutured and Martinez was administered pain medication. *Id*. at 864. On June 2, 2009, Martinez returned to St. Vincent's with continued pain to his right hand and a "2-3 square cm of wood laminate [was] found in the space between the 4th and 5th metacarpals." *Id*. at 854. Treatment notes reflect laceration of the ulnar nerves, which was "repaired", but there was "no significant inflammation or infection." *Id*. at 855. The wood was removed, and his hand was sutured. *Id*.

The bulk of the remainder of Martinez's medical records relate to his back impairments. Martinez began complaining to treatment providers of back pain in early October 2011, when he was treated at St. Vincent's after hurting his lower back "lifting a heavy TV." St. Vincent's Med. Rec., Ex. 1F, R. at 367-68. At the time, Martinez described his pain as a nine out of ten, with "stiffness", "sharp" pain with motion, but with "no numbness/weakness." *Id*. He was given pain medication. *Id*. at 368. He was next seen at St. Vincent's on October 25, 2011 with continued complaints of back pain. *Id*. at 374. Martinez stated that his back was "getting better" but that he moved a dresser and "threw [his] back out again." *Id*. He described his pain as "moderate", "dull aching", but "constant". *Id*. He was again prescribed pain medication and

encouraged to follow up with an orthopedist. *Id*. at 375. He was not seen again for back pain until April 11, 2012 when he returned to St. Vincent's with complaints of back pain and traumatic arm pain. *Id*. at 377. Martinez's chief complaint was "bilateral arm pain", which he noted was "severe", that started after he was lifting rocks. *Id*. at 377-78. He further stated that he had "some tightness in [his] lower back with aching down the [right] upper thigh." *Id*. at 378. He was given a pain medication injection as well as a prescription for oral pain medication. *Id*.

Martinez was seen again at St. Vincent's on October 14, 2012 when he complained of back pain that began after "helping somebody move." *Id*. at 382. He described his pain as feeling "like [a] screwdriver [was] in [his] back" and stated that the pain was "primarily on [the] right" but extends to "buttocks and left leg." *Id*. at 383. He was given medication for pain and muscle spasms, as well as a steroid, and was released with a referral to an orthopedist. *Id*. at 384-85. He returned to St. Vincent's two days later with "severe back pain" and stated that he ran out of medication. *Id*. at 387. He was given more pain medication and again was given a referral to an orthopedist for "re-evaluation and further treatment." *Id*. at 389. The following day, October 17, 2012, Martinez was seen by Dr. Richer at Orthopaedic Specialty Group ("OSG") for a "pulling sensation" in his back that began when he was helping someone move. OSG Med. Rec., Ex. 2F, R. at 403. The notes from that visit reflect that Martinez had "difficulty with forward bending secondary to pain, tenderness to palpation over the lumbar paraspinals" and "negative straight leg raise bilaterally." *Id*. X-rays revealed "no evidence of acute bony abnormality" and he was given a referral for physical therapy and told to follow up in six weeks if his condition failed to improve. *Id*. On October 21, 2012, Martinez returned to St. Vincent's with further complaints of lower back pain, which he described as ten out of ten and "spasm-

like." St. Vincent's Med. Rec., Ex. 1F, R. at 391. He was given an injection for the pain as well as refilled prescriptions for pain and muscle spasms. *Id*. at 393.

Martinez was seen again at OSG on November 1, 2012 for a "[f]ollow-up lumbar strain, lumbago." OSG Med. Rec., Ex. 2F, R. at 402. Martinez states that he exacerbated his lower back injury, which he sustained in October. *Id*. He stated that the pain was "localized to the low back", and treatment notes reflect that he was in "no apparent distress" and was "ambulating with a normal gait" but had "negative straight leg raise bilaterally." *Id*. He was prescribed pain medication and encouraged to use a heating pad. *Id*. He was given a renewed referral for physical therapy and told to follow up in four weeks if there was no improvement. *Id*. Martinez returned to St. Vincent's on November 21, 2012 with renewed back pain after injuring himself moving a refrigerator. St. Vincent's Med. Rec., Ex. 1F at 396-97. Martinez also reported that he fell a few times because "his right leg would give out on him." *Id*. at 396. He was given an injection for pain and medication for pain and back spasm. *Id*. at 397-98. On November 29, 2012 he was examined at Bridgeport Hospital where X-rays revealed "minimal curvature of the lumbar spine concave to the left" and "narrowing of the intervertebral disc space at T12-L1, which suggests discitis." Bridgeport Hosp. Med. Rec., Ex. 3F, R. at 452.

Martinez was admitted to Bridgeport Hospital on November 30, 2012 for an "epidural abscess secondary to IV drug use" and "T12-L1 diskitis." *Id*. at 422. Upon admission, he complained of "significant back pain with very minimal movement." *Id*. at 427. An MRI showed "acute infectious diskitis at T12-L1 level with an epidural phlegmonous component measuring 7 mm in AP dimension." *Id*. at 422-23. Martinez remained in Bridgeport Hospital until December 13, 2012, during which time the abscess was aspirated and biopsied, and he was treated for pain and infection. *Id*.; *see also, generally,* Ex. 3F. He was admitted to Bridgeport

Manor on December 14, 2012 for continued intravenous antibiotic administration, where he stayed for over two months. Bridgeport Manor Med. Rec., Ex. 6F, R. at 479-504. While at Bridgeport Manor, he was seen at OSG where Dr. Hermele noted that Martinez had "an impressive diskitis involving destructive changes of the T12-L1 vertebral bodies" but there was "[n]o epidural abscess." OSG Med. Rec., Ex. 2F, R. at 400. He was seen at Bridgeport Hospital again on January 28, 2013 for an infected PICC line, which was removed and replaced. Bridgeport Hosp. Med. Rec., Ex 3F, R. at 405-12. The records from that visit reflect that Martinez's "lumbar pain [was] much improved." *Id*. at 407. He was released back to Bridgeport Manor.

Martinez also underwent an MRI on February 5, 2013 at Bridgeport Hospital which showed "worsening kyphotic deformity with further collapse of the anterior aspects of the vertebral bodies at T12-L1" and "[w]orsening endplate erosions of the inferior endplate of T12 and superior endplate of L1 with further collapse of the T12 and L1 vertebral bodies." Bridgeport Hospital Med. Rec., Ex. 5F, R. at 475. Further, the MRI revealed "less edema compared to the prior study although there is still some residual edema" and "mild fluid within the disc space [T12-L1] which is also less than suggesting continued changes of discitis and osteomyelitis." *Id*. The MRI findings were "suggestive of improving, albeit persistent, discitis and osteomyelitis at T12-L1 with worsening bony erosive changes and further collapse of the T12-L1 vertebral bodies" and "worsening kyphotic deformity at this level." *Id*. at 476. There were "[d]iffuse disc bulge[s]" noted at other disc levels as well. *Id*. at 475-76. On February 21, 2013, Martinez was seen by Dr. Miljkovic from Internal Medicine & Infections Disease, who reported that Martinez still had occasional back pain but had completed his IV antibiotics and ordered the PICC line removed. Dr. Miljkovic Med. Rec., Ex. 4F, R. at 466. He noted that

Martinez was "in no acute distress" and his back had "[n]ormal curvature [and] no tenderness." *Id*.

Martinez was released from Bridgeport Manor on February 22, 2013. Bridgeport Manor Med. Rec., Ex. 6F, R. at 479-504. He was referred to Southwest Community Health Center ("SCHC") for outpatient pain management care for his lower back. SCHC Med. Rec., Ex. 7F, R. at 518. He was examined on February 26, 2013 and reported that his back pain was a seven out of ten and treatment notes reflect that Martinez had deep palpation with reduced range of motion. *Id*. On March 22, 2013, Martinez was seen again at SCHC for back, neck, and joint pain. *Id*. at 513-14. Records reflect that he had muscle spasm in his back and "mild pain [with] motion" and "tenderness." *Id*. at 515. He was given medication and a referral for mental health and pain management. *Id*. at 516. Martinez was seen again at SCHC on April 30, 2013 for "diffuse and sharp" back pain that occurred after "lifting a heavy object and twisting movement." *Id*. at 509. Records reflect that Martinez had "tenderness" in his back, "moderate pain [with] motion", and "deep palpation assoc[iated] with reduced" range of motion. *Id*. at 511. He was given pain medication and directed to follow up in six weeks. *Id*. at 512. Martinez returned to SCHC on June 6, 2013 with complaints of "fluctuating" lower back pain which he described as "an ache" and "aggravated by bending and lifting." *Id*. at 505. Records note that Martinez had "muscle spasm", "moderate pain [with] motion", and "mildly reduced" range of motion. *Id*. at 507. He was told to follow up in four weeks. *Id*.

On June 21, 2013, Martinez underwent a consultative psychiatric exam by Dr. Jesus Lago. Dr. Lago Report, Ex. 8F, R. at 534. Dr. Lago noted that Martinez "walked in with a cane", "demonstrated normal posture", "walked in slowly" with a "slow gait", and "appeared to be in pain." *Id*. at 535. The report reflects that Martinez was in normal health until 2012 when

he began having "significant back pain" which was initially diagnosed as a "possible disc herniation" but the final diagnosis was "abscess to the back" which was removed. *Id*. Martinez reported that "he [could] not work due to the back pain", which "has been somewhat depressing for him" but he is "somewhat optimistic." *Id*. at 535-36. Dr. Lago reported that Martinez's "[d]epressive days have never outnumbered euthymic days" and "[i]f he has back pain, he has difficulty sleeping." *Id.* at 536. Martinez reported that "[h]is energy [was] mildly low" and had been "somewhat more withdrawn than usual" because of his back pain. *Id*. Martinez reported that he was using marijuana everyday and had last used heroin, cocaine, and crack two weeks before the examination. *Id*. Dr. Lago reported that Martinez did "light chores", took care of his activities of daily living, went for walks "to rehabilitate his back", "had many friends", and "function[ed] independently." *Id*. at 537. With respect to his mental health, Dr. Lago reported that Martinez was "very relaxed, pleasant, and cooperative" and "ha[d] been somewhat depressed over the past eight months." *Id*. Dr. Lago diagnosed "depressive disorder, not otherwise specified", "polysubstance dependence (heroin, crack, cocaine, and marijuana)", and "opioid analgesic dependence – in sustained full remission." *Id*. Dr. Lago opined that Martinez's "[s]ocial interaction with supervisors and coworkers in the past ha[d] been quite good despite his substance abuse" and that he was "capable of adapting to work setting" but "need[ed] to remain drug free." *Id*. at 538.

Two reviewing physicians provided consultative examinations and a case analysis, including RFC assessments, in connection with Martinez's benefits applications. Ex. 4A, R. at 114; Ex. 6A, R. at 139. On July 11, 2013, Dr. Nancy Armstrong determined that Martinez's exertional limitations were as follows: he could occasionally (one-third or less of an eight hour day) and frequently (between one-third and two-thirds of an eight hour day) carry and/or lift ten

pounds; he could stand and/or walk for a total of four hours; he could sit for more than six hours

on a sustained basis in an eight-hour day; and he could push and/or pull for an unlimited time.

Ex. 4A, R. at 115. Dr. Armstrong added that Martinez would need a cane for distances only. *Id*.

With respect to Martinez's postural limitations, Dr. Armstrong opined that he could occasionally

climb ramps and/or stairs, stoop, kneel, crouch, or crawl; he could never climb ladders, ropes,

and/or scaffolds; and he could frequently balance. *Id*. Further, Dr. Armstrong opined that

Martinez did not have any manipulative, visual, communicative, or environmental limitations.

*Id*. at 116. On September 9, 2013, Dr. Khurshid Khan made the exact same RFC findings. Ex.

5A, R. at 127-29.

Martinez was seen again for "moderate" back pain on August 29, 2013 at Bridgeport

Hospital. Bridgeport Hosp. Med. Rec., Ex. 9F, R. at 539. Martinez reported that his pain was

exacerbated by "movement, bending over, standing, walking, sitting, [and] changing position"

but reported that it was "different than the pain with discitis." *Id*. at 539-40. Martinez was

encouraged to follow up with an orthopedist. *Id*. at 542.

On October 1, 2013, Martinez was seen at St. Vincent's for "traumatic" toe pain after

dropping a toilet on his foot. St. Vincent's Med. Rec., Ex. 17F, R. at 867. X-rays revealed "no

evidence of fracture or dislocation" and Martinez was released with pain medication. *Id*. at 869.

Medical records reflect two prior foot injuries. On December 9, 2010, Martinez was treated at

St. Vincent's after dropping a "cast iron pipe" on his foot. St. Vincent's Med. Rec., Ex. 16F, R.

at 847. He was diagnosed with a small fracture in his first toe and given pain medication,

crutches, and a cast. *Id*. at 851. Martinez was also treated at SCHC on December 15, 2010 and

January 25, 2011 for pain to the big toe on his right foot, though it is unclear whether the injuries

10

were related.  SCHC Med. Rec. Ex. 7F at 519-20.  He was directed have X-rays taken and was given pain medication.  *Id.*

On November 30, 2013, Martinez returned to Bridgeport Hospital for back, neck, and knee pain after a minor motor vehicle accident.  Bridgeport Hosp. Med. Rec., Ex. 10F, R. at 623. He was discharged with pain medication for a "likely muscle strain/contusion."  *Id.* at 626.

The next medical record is from October 6, 2014, when Martinez returned to Bridgeport Hospital for "back pain after bending forward a week ago" after having "no relief" from Motrin. *Id.* at 627.  Martinez reported his pain was ten out of ten and was radiating down his left leg to his ankle.  *Id.* He was using a cane and the records reflect that "pain and presentation are comparable to previous epidural abscess on 11/30/12."  *Id.*  An MRI revealed "[m]inor changes … but no evidence to suggest recurrent epidural abscess or discitis" and "postinfectious fusion of T12 and L1 vertebrae … [but t]he other vertebral body heights and signal [were] normal with normal alignment."  *Id.* at 630-31.  He was medicated and discharged.  *Id.* at 632.  He returned to Bridgeport Hospital on October 12, 2014 where he complained of "continued lower back pain radiating down" his legs, made worse with "twisting and bending."  Bridgeport Hosp. Med. Rec., Ex. 11F, R. at 637.  He was given a pain patch and records reflect that "additional opiate medication is inappropriate and dangerous" to Martinez.  *Id.*

On October 17, 2014, Martinez was transported to Bridgeport Hospital after appearing "diaphoretic [and] tachycardic" at the methadone clinic.  *Id.* at 639.  He complained of "right wrist pain that radiate[d] to right elbow" and records reflect "noted" loss of range of motion and "a central puncture mark" on his right wrist. *Id.* at 640-41.  He was diagnosed with sepsis and an abscess on his right wrist, which was aspirated.  *Id.* at 643-44.  Treatment notes from October 21, 2014 reflect that Martinez's "right arm [was] swollen from shoulder to hand."  *Id.* at 655. While

in the hospital, an MRI of his back revealed "[c]omplete resolution of previous discitis and osteomyelitis", "resolution of prior infection from 2012", and also a "[s]mall left-sided disc herniations at L4/5 and L5/S1 with minimal or no interval change." *Id.* at 651. Treatment notes from an October 23, 2014 consultation with Dr. Perry Shear reflect that Martinez has "noticed increased low back pain" over the past month that will "[i]ntermittently" radiate down his left leg and is made worse with standing. *Id.* at 664. In reviewing the MRI, Dr. Shear noted that Martinez "may have early signs of L4-L5 diskitis" and noted "positive enhancement in the epidural space consistent with the epidural abscess." *Id.* at 665. Dr. Shear "[did] not recommend neurosurgical intervention." *Id.* Another MRI of his spine was done on December 1, 2014 and showed "worsening discitis with space collapse and endplate destruction at L4-5, compared to prior MRI on 10/22/14." *Id.* at 669. Later treatment notes, however, state that "[a]lthough read as 'worsening discitis' at the L4-5 space, the [12/1/14] lumbar MRI actually displays expected changes as the disc space will collapse and the level will eventually fuse over time." *Id.* at 673. Martinez was discharged from the hospital on December 4, 2014.

Martinez had an outpatient follow up appointment with Dr. Shear at OSG on December 17, 2014, where treatment notes reflect that he was "[d]oing well." OSG Med. Rec., Ex. 21F, R. at 980. The records reflect that Martinez was in "[n]o acute distress" and was ambulating "without issue" with a cane. *Id.* Dr. Shear reviewed the December 1 MRI and noted "interval worsening of the diskitis" but "that the disk space will collapse and the level with eventually fuse over time and it is an expected change." *Id.* Another MRI was taken on January 16, 2015 and, compared to the MRI from December 1, showed that the alignment at T12-L1 was "unchanged" and that there was "[m]ild improvement" at L4 and L5. Bridgeport Hospital Med. Rec., Ex. 19F, R. at 947. The MRI showed "no significant change" to "persistent disc bulge[s]" at some disc

levels.  *Id*.  Overall, the MRI showed that the "previously noted epidural abscess [was] markedly improved since the prior exam and appears nearly resolved" and that "[m]ultilevel degenerative changes [were] essentially unchanged."  *Id*. at 948.  Martinez was also seen by Dr. Shear on January 14, 2015 and treatment notes reflect that Martinez "has not noticed any change in his back pain", but that the pain "is better when he is moving around" and worse with bending. OSG Med. Rec., Ex. 21F, R. at 979.  Notes also reflect "severe decreased flexion of the lumbar spine and moderate decreased extension."  *Id*.  OSG treatment notes from January 28, 2015 reflect that Martinez was "showing improvement with improved MRI of the lumbar spine."  *Id*. at 978; *see also id*. at 976 (March 11, 2015 treatment note states MRI showed "improvement of the epidural abscess" and there was "no sign of infection").  Another MRI was performed on April 27, 2015 which showed either no change or improvement in the condition of disc spaces. OSG Med. Rec., Ex. 21F, R. at 1013-14.

On March 7, 2015, Dr. Shear referred Martinez to aquatic physical therapy two times per week for eight weeks.  Phys. Ther. Treatment Notes, Ex. 13F, R. at 720.  Treatment notes reflect that Martinez's condition was improving with continued aquatherapy.  *See generally* Ex. 13F; R. at 723 (March 17, 2015: pain an eight out of ten pre-treatment, two out of ten post-treatment); R. at 738-39 (April 3, 2015: Martinez reported that the pool was helping; pain a five out of then pre-treatment, two out of ten post-treatment); R. at 742 (April 7, 2015: pain a five out of ten pre-treatment, two out of ten post-treatment); R. at 746 (April 13, 2015: same); R. at 750 (April 20, 2015: same).  On June 10, 2015, Dr. Shear noted that Martinez "completed an aquatic physical therapy program" and "continues to improve" and "will undergo land physical therapy."  OSG Med. Rec., Ex. 21F, R. at 975.  Dr. Shear also reviewed the April 27 MRI and noted the "improvement of the discitis and osteomyelitis."  *Id*.

On July 30, 2015, Dr. Shear submitted another referral for continued physical therapy two times per week for eight weeks and an evaluation form noted that Martinez could stand for 20 minutes and ambulate for 30 minutes without difficulty. Phys. Ther. Treatment Notes, Ex. 13F, R. at 754, 759. Martinez participated in twenty sessions of physical therapy from August 19, 2015 to January 8, 2016. *Id*. at 762-835. OSG records from September 2, 2015 reflect that Martinez was "doing well" with "intermittent low back pain, which [was] well controlled with the use of Lidoderm patches[.]" OSG Med. Rec., Ex. 21F, R. at 973. A September 8, 2015 MRI showed "improvement" at L4-5 since the April 27 MRI. OSG Med. Rec., Ex. 21F, R. at 2012. Notes from Martinez's September 29, 2015 physical therapy session reflect that he re-injured his back moving furniture, but he reported that he had less pain with bending and reaching. Phys. Ther. Treatment Notes, Ex. 13F, R. at 793. Martinez saw Dr. Shear again on November 11, 2015 who noted that Martinez's back pain was "made worse with bending" but was improving with aquatherapy and noted that his "diskitis osteomyelitis ha[d] resolved." OSG Med. Rec., Ex. 21F, R. at 972. Notes from a December 16, 2015 examination with Dr. Shear reflect that Martinez's pain "continue[d] and [was] made worse with bending or lifting" with "numbness in the left thigh", his "normal activities [were] still markedly limited", and the symptoms increased with increased activity, such as "a lot of walking." *Id*. at 971. Dr. Shear noted Martinez "may require ongoing pain management." *Id*.

Notes from a January 27, 2016 follow-up reflect that physical therapy "significantly improved [Martinez's] symptoms" and that his "back pain [was] about 40% improved." *Id*. at 969. Dr. Shear renewed a referral for physical therapy. *Id*. Treatment notes from February 18, 2016 reflect, though, that Martinez had "increasing low back pain" and Dr. Shear ordered a follow-up MRI. *Id*. at 968. An MRI was taken on February 23, 2016 and showed "no specific

evidence of active osteomyelitis in the current findings" and the "marked degenerative changes at L4-5 … could be attributed to the sequelae of prior discitis and osteomyelitis." OSG Med. Rec., Ex. 21F, R. at 1010-11. Martinez saw Dr. Shear for a follow-up on March 4, 2016, and treatment notes reflect that the MRI showed "no acute infection" but "degenerative disk disease at L4-L5 with moderate spinal stenosis and right greater than left lateral recess stenosis" and "degenerative disk disease at L5-S1." OSG Med. Rec., Ex. 21F, R. at 967. Dr. Shear encouraged Martinez to lose weight and did not "consider any lumbar injections." *Id*.

Martinez filed for SAGA Cash Benefits and Dr. Shear was asked to provide a medical report. OSG Med. Rec., Ex. 22F, R. at 1015. Dr. Shear noted on the form that he treated Martinez for "lumbar degenerative disk disease", which did not prevent Martinez from working because Martinez "does not work". *Id*. at 1019. Further, Dr. Shear noted that he expected Martinez to be out of work between six and twelve months. *Id*. The remainder of the form was left blank, including the physical capacities evaluation and the mental RFC evaluation. *Id*. 1019-23.

## B. Procedural History

The SSA initially denied Martinez's disability benefits claims on July 12, 2013, finding that "[t]he evidence [on] file [was] not sufficient to fully evaluate [Martinez's] claim and the evidence needed [could not] be obtained." DIB Int'l Explanation, Ex. 3A, R. at 103-04. Further, the SSA found that Martinez's condition was "not severe enough to keep [him] from working" and although it did "not have sufficient vocational information to determine whether [he could] perform any of [his] past relevant work", the SSA determined that Martinez could "adjust to other work." DI Int'l Explanation, Ex. 4A, R. at 119. Martinez's claims were again denied upon reconsideration on September 18, 2013. Reconsideration Transmittals, Ex. 7A, R. at 146; Ex.

8A, R. at 147. The reasons stated were the same as those in the initial determination. DIB

Reconsid. Explanation, Ex. 5A, R. at 132; DI Reconsid. Explanation, Ex. 6A, R. at 144-45.

On January 7, 2014, Martinez requested a hearing before an Administrative Law Judge

("ALJ"). Hr'g Request, Ex. 7B, R. at 178. After multiple adjournments, the hearing was held on

September 6, 2016 before ALJ Ronald Thomas. Tr. of ALJ Hr'g, R. at 40. At the hearing,

Martinez testified that his last steady employment was in 2006, moving and delivering office

equipment and "work[ing] with blueprints." *Id*. at 42. After a short incarceration, Martinez

worked "odd jobs here and there" but "could never work a full day" because of his back issues.

*Id*. at 43. Martinez testified that since 2011 he was complaining about back pain and in 2012 he

was diagnosed with "discitis and an infection" in his back, which mainly affected his lower back,

with pain radiating down his legs. *Id*. at 53, 60. He testified that he has "deteriorated discs" in

his back, stemming from two infections, and that he is "gradually … just been falling apart." *Id*.

at 44. He testified that he has back pain whenever he bends down or when he does "anything

strenuous", and he wears a back brace and pain patches in addition to taking daily pain

medication. *Id*. at 44-45. He testified that the medication helps with the pain but does not help

him "move around and stuff" and, although discussed, he has not had back surgery. *Id*. at 45.

Martinez testified that his back pain "messes with [his] concentration" and he would not

be able to do a job where he would have to "insert tab A into slot B." *Id*. at 60. With respect to

his physical limitations because of his back, Martinez testified that he walks with a cane, that his

back hurts when he walks "for a long period of time", and that he can only walk for about a

block at a time. *Id*. at 44-45. Further, Martinez testified that he: could not lift anything over 20

pounds; could only stand in one spot for fifteen minutes before he has to sit down or move

around; and could only sit for between 30 and 60 minutes before he has to walk around for 10 to

30 minutes.  *Id*. at 45-46, 55. He also testified that his back pain was made worse with his arms

out in front of him because it "br[ought] pressure on [his] back."  *Id*. at 60-61. With respect to his

lifestyle, Martinez testified that he could dress himself but it takes him "longer than … average";

he has a chair in the shower with him; he can drive but "not … long distance"; he goes grocery

shopping; he spends some time on the internet, including Facebook; he watches movies; and he

sometimes goes out to dinner. *Id*. at 47-50.  He testified that he lives with his parents and does

not help with the chores much except that he: makes his bed and "keep[s his] area clean"; takes

out the garbage; and helps with raking until his back hurts.  *Id*. at 47-48.  Martinez also testified

that he smokes cigarettes and is "attending outpatient services and meetings" for substance

abuse, for which he was sober for a year at the time of the hearing.  *Id*. at 50.  He is also on

methadone for "pain management" and to "help with … opioid cravings."  *Id*. at 52.

Other than his back, Martinez testified that he was under the care of a counselor and on

medication for depression and anxiety.  *Id*. at 46, 55.  Martinez also testified that he had surgery

on his right hand in 2000[1] and "every now and then" it still hurts and he "drop[s] things

sometimes."  *Id*. at 52-53, 59.  He testified that he can do "fine motor stuff" such as use a

screwdriver and put two paperclips together, and can do so until his "hand starts to … cramp up

a little" but would not be able to use a keyboard for eight hours.  *Id*. at 59.  He also testified that

he injured himself multiple times over the years doing "odd jobs" like moving rocks and moving

furniture.  *Id*. at 54.  Further, Martinez testified that he has "bullet fragments" in his left thigh

since 1997 which sometimes affects his ability to stand still.  *Id*. at 55.  Also, Martinez testified

that he naps every day, usually "around 2:00 or 3:00 in the afternoon … anywhere from an hour

to two hours."  *Id*. at 58.

---

[1] There are no treatment notes that reflect that Martinez had hand surgery in 2000, though there are records for a
2009 hand surgery.  St. Vincent's Med. Rec., Ex. 16F, R. at 855-63.

The ALJ then heard testimony from Vocational Expert ("VE") Richard Hall ("Hall"), who testified that Martinez's past relevant work as a machine operator was a medium exertion, semi-skilled position; his past work as a stock clerk was a medium exertion, unskilled position; and his past work as a customer clerk was a light exertion, semi-skilled position. *Id.* at 63-64. For the first hypothetical, the ALJ asked Hall to assume a person of Martinez's age, education, and work experience who could perform sedentary work and who was "unable to complete tasks competitively, from beginning to end, and is thus unable to stay on task for more than 80% of the time in the workplace." *Id.* at 64. Hall testified that, with those limitations, Martinez's past relevant work could not be performed and "there would be no jobs for such a person." *Id.*

For the second hypothetical, the ALJ asked Hall to assume a person of Martinez's age, education, and work experience who could perform sedentary work with the following limitations: could only occasionally balance and bend, crawl and twist, squat and kneel, and climb; could not climb ropes, ladders, and scaffolds; and could only occasionally interact with co-workers, supervisors, and the public. *Id.* at 64-65. Hall testified that with those limitations, Martinez's past relevant work could not be performed. *Id.* at 65. Hall opined, however, that there were at least three jobs that someone with those limitations could perform: (1) document preparer,[2] a sedentary, unskilled position with 120,000 national jobs and 1,110 in Connecticut; (2) addresser, a sedentary, unskilled position with 115,000 national jobs and 1,000 in Connecticut; and (3) monitor, a sedentary, unskilled position with 130,000 national jobs and 1,200 in Connecticut. *Id.* Hall testified that the available jobs would not change with the added limitation of "us[ing] a cane to ambulate." *Id.* He did, however, testify that the three examples

---

[2] When asked by Martinez's counsel, Hall testified that "there are multiple job duties under that heading" not just microfilming preparer, which is "officially obsolete" and, therefore, "the overall job would remain valid." *Id.* at 67.

would not be available with the added limitation of "occasional fingering, occasional handling, and occasional reaching", either bilaterally or on the dominant hand only. *Id*. at 66.

In a post-hearing submission, Martinez's attorney, Attorney Katz, objected to Hall's testimony on the basis that it was "hogwash." Post-Hrg. Brief, Ex. 16E, R. at 361. Specifically, Attorney Katz argued that it was "demonstrably the case that Hall's testimony as to job incidence data was 'conjured out of whole cloth' and [was] thoroughly fabricated." *Id*. at 363. As support for that contention, Attorney Katz argued that "addresser" was one of eight subcategories under a classification for which only 68,660 jobs existed nationally, therefore making it "mathematically impossible" that addresser alone yielded 115,000 available jobs. *Id*. Similarly, he argued that "surveillance system monitor" was one of five subcategories under a classification for which only 120,270 jobs existed nationally, therefore, again, making it "mathematically impossible" that surveillance system monitor alone yielded 130,000 available jobs. *Id*. With respect to "microfilming document preparer", Attorney Katz argued that it was "nonsense" for Hall to testify that the job included more than the obsolete microfilm preparer position. *Id*. at 364.

On October 4, 2016, the ALJ issued an opinion in which he found that Martinez was not "under a disability within the meaning of the Social Security Act from October 16, 2011 through the date of th[e] decision." ALJ Decision, R. at 22. At the first step, the ALJ found that Martinez was "not engaged in substantial gainful activity since October 16, 2011, the alleged onset date." *Id*. at 23. The ALJ clarified that Martinez "did odd jobs and 'dumpster diving' to earn money" but that there was "no indication that any of [that] work activity rose to substantial gainful activity levels." *Id*. At the second step, the ALJ determined that Martinez's impairments of "degenerative disc disease, status post discitis and osteomyelitis; polysubstance abuse; [and]

depressive disorder" were "severe impairments[.]" *Id*. at 24. The ALJ found that Martinez's "difficulty with his right hand" was non-severe. *Id*.

At the third step, the ALJ determined that Martinez "d[id] not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments[.]" *Id*. Specifically, the ALJ stated that he considered the criteria for "musculoskeletal listing for Disorders of the Spine" and found that Martinez's "multi-level degenerative disc disease" did not meet or medically equal that listing "because the objective medical findings [did] not provide evidence of nerve root compression, which ha[d] resulted in a limitation of the range of motion, motor loss, and accompanied by sensory or reflex." *Id*. Further, the ALJ opined that the "severity of [Martinez's] mental impairments, considered singly and in combination, [did] not meet or medically equal the criteria" for affective disorders or substance abuse disorders. *Id*.

The ALJ then assessed Martinez's Residual Functional Capacity ("RFC") and found that he could perform sedentary work with the following limitations: (1) could occasionally balance, bend, twist, squat, crawl, kneel, and climb; (2) could not climb ladders, ropes, or scaffolds; (3) could only occasionally interact with the public, supervisors, and co-workers; and (4) must use a cane to ambulate. *Id*. at 26. The ALJ stated that he "considered all symptoms and the extent to which th[ose] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence" in making his determination. *Id*. The ALJ concluded that Martinez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" with respect to his back. *Id*. at 27. The ALJ went on to conclude, however, that Martinez's "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and

other evidence in the record[.]" *Id.*  In doing so, the ALJ highlighted portions of the medical records that showed that Martinez injured his back multiple times while moving furniture, as well as portions of the medical records that reflected that Martinez's discitis had improved with treatment.  *Id.* at 27-28 (referencing Ex. 1F, 2F, 3F, 6F, 5F, 9F, 10F, 11F).

The ALJ noted that he gave "little weight" to a form from Martinez's treating orthopedist, Dr. Shear, because he "did not complete most of the form, including the residual functional capacity assessment."  *Id.* at 28 (referencing Ex. 22F).  The ALJ gave "great weight" to the State agency examiners' physical assessment because it was "consistent with the record as a whole, and with the additional evidence received at the hearing level."  *Id.* at 29 (referencing Ex. 6A).  The ALJ gave "less weight" to the State agency psychological assessment, however, because it limited Martinez to "simple work" due to his substance abuse, but Martinez testified at the hearing that "he had been sober for a year[.]" *Id.* (referencing Ex. 6A).  The ALJ opined that the stated RFC was "adequate to address the duration, frequency, and intensity of [Martinez's] symptoms, as well as any precipitating and aggravating factors."  *Id.*

At the fourth step, the ALJ determined that Martinez was "unable to perform any past relevant work[.]" *Id.* at 29.  At the fifth step, the ALJ concluded that, based upon Martinez's "age, education, work experience, and [RFC], there [were] jobs that exist in significant numbers in the national economy that [Martinez could] perform."  *Id.*  In doing so, the ALJ stated that Hall "offered reliable testimony regarding the numbers of available jobs" and "identified the sources he used in addition to his personal experience in determining the numbers."  *Id.* at 30.  The ALJ opined that Hall's testimony was "sufficient" and, therefore, the objections to the ALJ's testimony, lodged in the post-hearing brief, were not given much discussion.  *Id.*  The ALJ found that, based on Hall's testimony, Martinez was "capable of making a successful adjustment to

other work that exist[ed] in significant numbers in the national economy." *Id*. at 30-31. The ALJ determined that a "finding of 'not disabled' [was] therefore appropriate[.]" *Id*. at 31.

On November 7, 2016, Martinez filed a request for review of the ALJ's decision by the SSA's Appeals Council alleging that the decision was "not supported by substantial evidence and was not rendered in accordance with [l]aw." Request for Review, R. at 13. Finding that the was "no reason … to review the [ALJ's] decision", the Appeals Council denied Martinez's request for review on March 20, 2017. Notice of Appeals Council Action, R. at 1. Martinez then filed a complaint before this court on May 23, 2017, urging reversal of the Commissioner's decision. Compl, Doc. No. 1. The Commissioner filed its Answer and the record on July 28, 2017. Answer, Doc. No. 16. Martinez filed a Motion to Reverse the Decision of the Commissioner on January 26, 2018. Mot. to Reverse, Doc. No. 23. The Commissioner filed a Motion to Affirm its Decision on March 26, 2018. Mot. to Affirm, Doc. No. 24.

## III. Discussion

On review, Martinez asserts that the ALJ's decision was "not supported by substantial evidence in the record as a whole and/or … was not rendered in accordance with law." Mot. to Reverse, Doc. No. 23 at 1. Specifically, Martinez contends that the ALJ: (1) failed to properly develop the administrative record, Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 1; (2) offered a flawed vocational analysis, *id*. at 11; (3) insufficiently evaluated Martinez's claims of pain, *id*. at 19; and (4) provided a deficient analysis at step three, *id*. at 22.[3] The Commissioner responds that the ALJ's decision was "supported by substantial evidence and made by a correct application of legal principles." Mot. to Affirm, Doc. No. 24 at 1.

---

[3] Although Martinez lists his arguments in that order, the discussion will proceed in the sequential order consistent with the five-step standard of review.

A. Did the ALJ fail to develop the record?

Martinez argues first that the ALJ failed to develop the administrative record. Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 1. Specifically, Martinez argues that the ALJ failed to get medical source statements from Martinez's treating physicians, Drs. Shear and Richer of OSG, and Dr. Estime of SCHC, and that the record "contains no indication that anyone asked [Dr. Shear] or [Dr. Estime] for their opinion[s] as to what Mr. Martinez could or could not do on a function-by-function basis." *Id*. at 2. The Commissioner argues that the ALJ was not under a duty to obtain medical source statements because "the record contained adequate evidence from other sources", including "medical records and opinions from treating sources who examined [Martinez], and who offered insight into how his impairments would affect his ability to work and to undertake his activities of everyday life." Mem. in Supp. Mot. to Affirm, Doc. No. 2401 at 8-9.

In general, "the ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). "Social Security Administration rules provide that '[m]edical reports should include … [a] statement about what [the claimant] can still do despite [his] impairment(s) … Although [the SSA] will request a medical source statement about what [the claimant] can still do despite [his] impairment(s), the lack of the medical source statement will not make the report incomplete.'" *Tankisi v. Commissioner of Social Security*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). "[T]he plain text of the regulation does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity…. The regulation thus seems to impose on the ALJ a duty to solicit

such medical opinions." *Id.* (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)) (emphasis in original). The regulations state that the reports *should* include a statement about the claimant's residual capacity, and that the lack of a medical source statement is not necessarily fatal to the record. *See id.* Accordingly, it is not "per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. 2015).

Even without a medical source statement, an "ALJ's conclusions would not be defective if he requested opinions from medical sources and the medical sources refused." *Tankisi*, 521 F. App'x at 33-34. Further, the failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite extensive[,] … voluminous[,] … [and] adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34; *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)). "Remand is not always required when an ALJ fails in his duty to request opinions particularly where … the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi*, 521 F. App'x at 34. That is particularly true where the record includes assessments of the claimant's limitations from a treating physician. *Id.*

Remand is required where an ALJ's residual functional capacity decision is "wholly unsupported by any medical evidence." *Jermyn v. Colvin*, 2015 WL 1298997, at *19 (E.D.N.Y Mar. 23, 2015). Remand is also necessary where "the medical records obtained by the ALJ do not shed any light on the [claimant's RFC], and [where] the consulting doctors did not personally

evaluate" the claimant. *Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (summary order). The record is insufficient when "[t]he medical records discuss [the claimant's] illnesses and suggest treatment for them, but offer no insight into how [the] impairments affect or do not affect [the claimant's] ability to work, or [his] ability to undertake the activities of daily life." *Id.* at 109.

Here, the ALJ noted that Dr. Shear received a State of Connecticut form for Martinez to obtain state aid, but "did not complete most of the form, including the [RFC] assessment." ALJ Decision, R. at 28. Accordingly, he assigned "little weight" to the form, because there was "no function-by-function assessment." *Id.* The ALJ gave "great weight" to Dr. Khan's physical assessment of Martinez's RFC because it was "consistent with the record as a whole, and with additional evidence received at the hearing level." *Id.* at 29. Further, the ALJ "considered the medical opinions provided by treating and examining sources, as well as non-treating sources" and "analyzed the opinion evidence in accordance with the regulations and agency rulings." *Id.* at 28. The ALJ had before him an extensive and voluminous medical record including treatment notes from multiple doctors, independent medical examinations, medical tests, reports, medical source opinions from agency consultants, and testimonial evidence. With that record, the ALJ determined that Martinez could perform sedentary work; could only occasionally balance, bend, twist, squat, crawl, kneel, and climb; could never climb ladders, ropes, or scaffolds; must use a cane to ambulate; and could only occasionally interact with the public, supervisors, and co-workers. ALJ Decision, R. at 26.

The medical record, as a whole, supports the ALJ's determination and is replete with notations and reports from treating physicians that offer insight into how Martinez's back impairment impacted his ability to "undertake the activities of daily life", *Guillen*, 697 F. App'x

at 109, and affected his physical abilities, consistent with the ALJ's RFC analysis. Ex. 1F, R. at 368 (pain worse with movement); Ex. 2F, R. at 403 (difficulty bending forward); Ex. 3F, R. 427 (minimal movement); Ex. 7F, R. at 518 (reduced range of motion in back); Ex. 7F, R. at 515 (mild pain with motion); Ex. 7F, R. at 511 (moderate pain with motion); Ex. 7F, R. at 505 (pain aggravated by bending and lifting); Ex. 8F, R. at 535 (ambulating with cane; reported doing light chores, taking care of activities of daily living, walking, and functioning independently); Ex. 9F, R. at 539 (back impairment exacerbated by movement, bending, standing, walking, sitting, and changing position); Ex. 11F, R. at 637 (pain made worse with twisting and bending); Ex. 21F, R. at 980 (ambulating without issue with cane); Ex. 21F, R. at 979 (pain better when moving around, worse when bending); Ex. 13F, R. at 754, 759 (could stand for 20 minutes and ambulate for 30 minutes without difficulty); Ex. 21F, R. at 971-72 (pain made worse with bending, lifting, or walking). The record also reflects, however, that Martinez's back impairment was improving over time. Ex. 3F, R. at 407 (pain much improved); Ex. 11F, R. at 651 (MRI shows complete resolution of discitis and osteomyelitis); Ex. 11F, R. at 673 (MRI displaying expected changes); Ex. 21F, R. at 976 (MRI showing improvement); Ex. 13F, R. at 723-50 (improvement with aquatherapy); Ex. 21F, R. at 2012 (MRI showing improvement); Ex. 21F, R. at 972 (diskitis osteomyelitis resolved); Ex. 21F, R. at 969 (back pain 40% improved). The ALJ took that improvement into consideration in determining Martinez's ability to work at a sedentary level with the imposed limitations.

Although the record did not include a formal RFC assessment by the treating physicians, it was "adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34. Given the record the ALJ had before him, he did not have "any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians." *Pellam*,

508 F. App'x at 90. Accordingly, the ALJ's determination regarding Martinez's limitations was supported by the medical evidence in the extensive and voluminous record. There were no obvious gaps in the record, and therefore, the ALJ was under no obligation to seek additional information. *See Guillen*, 697 F. App'x 107; *Pellam*, 508 F. App'x at 90; *Tankisi*, 521 F. App'x at 34; *Jermyn*, 2015 WL 1298997, at *19.

Martinez also argues that "[t]he [r]ecord contains no indication that anyone asked [Drs. Shear or Estime] for their opinion as to what Mr. Martinez could or could not do on a function-by-function basis." Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 2. The record, however, reveals otherwise. With respect to Dr. Estime, records from the 2013 Initial Disability Determination Explanation reflect that SCHC, where Martinez was treated by Dr. Estime, was contacted multiple times for medical source statements. Int'l Disability Determination Explanations, Ex. 3A, R. at 98; Ex. 4A, R. at 109. Those records note that requests were made in March, May, June, and September of 2013, and multiple messages were left to check on the status of the requests, but no source statements were provided. *Id.*; Ex. 5A, R. at 124. Further, Dr. Shear was given an opportunity to provide a function-by-function analysis for purposes of Martinez's application for cash benefits from the State of Connecticut. Ex. 22F, R. at 1018-23. The form sought an evaluation of Martinez's abilities consistent with an RFC assessment including: physical capacities such as sitting, standing, walking, lifting, carrying, reaching, grasping, handling, fingering, bending, crouching, twisting, and climbing stairs/ladders. *Id.* at 1020-21. Dr. Shear did not fill out any of those categories, noting only that Martinez did not work and he expected Martinez to be out of work between six and twelve months. *Id.* at 1019. Although it was not the ALJ who requested this information, the record still reflects that Dr. Shear was given the opportunity to opine on Martinez's physical limitations, and chose not to.

Accordingly, the ALJ's failure to procure formal opinions does not require remand under the circumstances.

B. Was the ALJ's Analysis at Step Three Deficient?

Martinez argues next that the ALJ's analysis at step three was deficient. Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 22. Specifically, he argues that the ALJ simply stated that Martinez's back impairment did not meet or medically equal the listing for Disorders of the Spine, section 1.04, but did not offer any analysis for that opinion. *Id.* at 22-24. The Commissioner argues that although the ALJ "did not provide a lengthy discussion of the evidence at step three," the ALJ "did indeed explain that [Martinez's] back impairment did not meet the listing because the record did not show all of the requisite medical criteria to meet or medically equal the listing" and he "discussed the medical evidence throughout his decision and demonstrated … that [Martinez] did not meet the requisite criteria[.]" Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 11-13.

"Step three of the analysis allows that 'when … an individual's impairment … meets or equals the level of severity described in the Listing, and also meets the durational requirement, disability will be found on the basis of the medical facts alone in the absence of evidence to the contrary.'" *Howarth v. Berryhill*, 2017 WL 6527432, at *3 (D. Conn. Dec. 21, 2017) (quoting Social Security Ruling 86-6: Titles II and XVI: The Sequential Process ("SSR 86-6"), 1986 WL 68636, at *3 (Jan. 1, 1986)). "To meet the listing, the impairment must satisfy all of the criteria in the listing…. An impairment that does not meet the listing can nonetheless be medically equivalent 'if it is at least equal in severity and duration to the criteria of any listed impairment.'" *Id.* (quoting 20 C.F.R. § 404.1526 (2015)) (internal quotation marks omitted). To satisfy this requirement, "the set of symptoms, signs and laboratory findings in the medical evidence

supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration to, the set of symptoms, signs and laboratory findings specified in the listed impairment." SSR 86-6 at *3.

"In determining whether a listing has been met or equaled under step three, the ALJ must consider all relevant evidence in [the] case record…. Additionally, the ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing." *Howarth*, 2017 WL 6527432, at *5 (internal quotation marks omitted). "The failure to articulate reasons can itself be the basis for remand…. This is true when the court 'would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.'" *Id.* (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)) (internal quotation marks omitted). It is not enough for the ALJ to "summarily dispose[] of step three with conclusory statements that [the claimant] did not meet [a] listing, followed by a recitation of the elements of each listing." *Nieves v. Colvin*, 2016 WL 7489041, at *5 (D. Conn. Dec. 30, 2016); *see also Peach v. Colvin*, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016) ("[T]his court cannot determine whether the ALJ properly considered the Listings because his only reference to them is a recitation of the standard.").

Even where the ALJ fails to articulate his reasons at step three, "the court is not required to remand if the ALJ's reasons can be discerned from other steps in the ALJ's analysis or from evidence in the record." *Howarth*, 2017 WL 6527432, at *5 (citing *Mongeur*, 722 F.2d at 1040). "Where the ALJ's reasons can be thus determined, the court has not required the ALJ to 'have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability' …. In

those cases, the ALJ's failure to articulate his reasons can be harmless error." *Id.* (quoting *Mongeur*, 722 F.2d at 1040) (internal citations omitted). Further, "the absence of an express rationale does not prevent [the court] from upholding the ALJ's determination regarding [a claimant's] listed impairments, [if] portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Berry*, 675 F.2d at 468.

In this case, the focus is Listing 1.04 for disorders of the spine. *See* ALJ Decision, R. at 24; Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 22. Listing 1.04 requires a showing that a claimant suffers from a spine disorder, including degenerative disc disease, that results in "compromise of a nerve root or the spinal cord" and at least one of the following: (a) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);" (b) "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;" and/or (c) "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively." 20 C.F.R. § 404.1525 app. 1, Listing 1.04.

In his step three determination, the ALJ opined that Martinez's "multi-level degenerative disc disease [did not] meet[] or medically equal[] Listing 1.04 because the objective medical findings [did] not provide evidence of nerve root compression, which … resulted in a limitation of the range of motion, motor loss, and [was] accompanied by sensory or reflex [loss]." ALJ

Decision, R. at 24.  The ALJ further opined that "none of [Martinez's] treating or examining physicians have concluded that [Martinez's] back impairments [met] or medically equal[ed] any of the Listings."  *Id.*  The ALJ provided no further explanation for his determination and "summarily disposed of step three with conclusory statements … and a recitation of the elements", which is insufficient for step three.  *Nieves*, 2016 WL 7489041, at *5, *Peach*, 2016 WL 2956230, at *4.  Indeed, the Commissioner even conceded that "the ALJ did not provide a lengthy discussion of the evidence at step three."  Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 12. Accordingly, the ALJ's step three analysis was insufficient.

The question, then, becomes whether the reasons for the ALJ's step three decision "can be discerned from other steps" in his analysis "or from evidence in the record" which "indicate that his conclusion was supported by substantial evidence."  *Howarth*, 2017 WL 6527432, at *5; *Berry*, 675 F.2d at 468.  The Commissioner argues that the remainder of the ALJ's opinion makes clear the reasons why the ALJ found that Martinez's impairments did not meet or medically equal Listing 1.04.  Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 12.  The ALJ determined, inter alia, that Martinez did not meet step three because there was no indication that his back impairment resulted in motor loss or was accompanied by sensory or reflex loss.  ALJ Decision, R. at 24.

The Commissioner argues that the ALJ found that Martinez presented in October 2012 with "no sensory or reflex loss, and no numbness" and, therefore, the reasoning for that portion of the ALJ's step three decision can be discerned from the record.  Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 12 (referencing ALJ Decision, R. at 27).  Although the ALJ did indeed make that statement, he provided no reference to the record as support.  He seems to be referring to treatment notes from October 14, 2012, but those records make no mention of whether

Martinez was suffering from sensory or reflex loss, or numbness. *See* ALJ Decision, R. at 27 (referencing Treatment Notes from October 14, 2012, Ex. 1F, R. at 382-86). In fact, the treatment notes from that hospital visit explicitly state that Martinez's back pain radiated down his left leg which felt "like it wanted to give out" and "like he [was] going to get a Charley horse." Ex. 1F, R. at 383. Further, treatment notes from that visit state that Martinez "move[d] with a lot of difficulty", had "limited [range of motion] in all directions", and had "significant difficulty moving." *Id*. at 383-84. Nowhere else in his opinion did the ALJ reference sensory or reflex loss or numbness. Accordingly, that single, unsupported statement about Martinez's supposed lack of "sensory or reflex loss" and "numbness", on one occasion, is insufficient to discern the reasons for the ALJ's step three determination. That is particularly true where the ALJ references medical records that would tend to undermine his step three determination. Specifically, the ALJ referenced that at certain points, records reflect that Martinez had "positive straight leg raise", "moderately reduced flexion and extension of the lumbar spine", and "decreased sensation", all of which factor into a determination of an impairment under Listing 1.04. ALJ Decision, R. at 27-28.

The ALJ's step three discussion was insufficient and the remainder of his decision does not provide adequate reassurance that his decision at step three was supported by substantial evidence. Accordingly, the determination at step three was deficient and warrants remand.

C. Did the ALJ Improperly Evaluate Martinez's Complaints of Pain?

Martinez argues next that the ALJ improperly evaluated Martinez's pain. Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 19. Specifically, Martinez argues that, despite consistent complaints of pain throughout the medical record, the ALJ discounted Martinez's pain "to insignificance." *Id*. The Commissioner argues that the ALJ acknowledged Martinez's pain but

found that "his claims of disabling pain and disabling functional limitations were not fully consistent with the medical and non-medical evidence of record", including Martinez's own statements. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 13-16.

Per the Social Security regulations, Martinez's subjective statements about his pain, taken alone, are not sufficient for an ALJ to make a disability finding. 20 C.F.R. § 416.929(a). An ALJ must employ a two-step process for evaluating symptoms, such as pain. "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's" pain. *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order). An ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). The ALJ "will consider all of [a claimant's] statements about [his] symptoms, such as pain, and any description [his] medical sources or nonmedical sources may provide about how the symptoms affect [his] activities of daily living and [his] ability to work." *Id.* An ALJ must have "objective medical evidence from an acceptable medical source" that shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id.*

If the ALJ finds that the first step is met, then he must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(2)). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence but will not reject a claimant's subjective assessment of the intensity and persistence of his pain "solely because the available

objective medical evidence does not substantiate [his] statements." 20 C.F.R. §§ 416.929(c)(1),

(2). "However, if a claimant's statements about [his] symptoms are not substantiated by the

objective medical evidence, the ALJ must consider the other evidence and make a finding on the

credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security*

*Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the

following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain;

"[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of

any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain

relief; measures used to relieve pain; and "[o]ther factors concerning … functional limitations

and restrictions due to pain[.]" 20 C.F.R. § 416.929(c)(3).

Further, an ALJ will consider a claimant's subjective claims of pain "in relation to the

objective medical evidence and other evidence, in reaching a conclusion as to whether [he is]

disabled" and will consider "whether there are any inconsistencies in the evidence and the extent

to which there are any conflicts" between the claimant's subjective claims of pain and the "rest

of the evidence" including the claimant's history, laboratory findings, and medical source

statements regarding pain. 20 C.F.R. § 416.929(c)(4). If an ALJ determines that a claimant does

have severe impairments, but the impairments do not meet or equal a listed impairment, then the

ALJ "will consider the impact" of the claimant's impairment or impairments and related pain on

the claimant's residual functional capacity. 20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's

statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (citing *Social*

*Security Ruling 96-7p*, 1996 WL 374186, at *2)).  In making such a determination, the ALJ must provide more than just "a single, conclusory statement" regarding the claimant's credibility or a recitation of the relevant factors, but "remand is not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* (citing *Mongeur*, 722 F.2d at 1040).

Here, the ALJ concluded that Martinez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but declined to credit Martinez's testimony regarding the "intensity, persistence, and limiting effects of [those] symptoms."  ALJ Decision, R. at 27.  The ALJ found that Martinez's statements were "not entirely consistent with the medical evidence" and other record evidence.  *Id.*  The ALJ acknowledged throughout his decision that Martinez was suffering from back pain.  *See id.* at 26 (noting Martinez's testimony that he had pain with bending; was on pain medication; was limited in his ability to walk, stand, sit, and lift); *id.* at 27 (noting hospital records for complaints of back pain; noting pain relief measures); *id.* at 28 (noting improvement in pain through physical therapy).  In making this determination, though, the ALJ referenced Martinez's reported activities that conflicted with his subjective claims of disabling pain.  *Id.* at 26 (noting that Martinez drove, took the bus, rakes leaves, takes out the garbage).  Further, the ALJ noted the many times that Martinez re-injured himself while participating in strenuous activities, which were also inconsistent with Martinez's claims of disabling pain.  *Id.* at 27 (referencing Ex. 1F).  Indeed, the record reflects that Martinez routinely injured himself moving furniture, appliances, and other heavy objects.  *See* Ex. 1F, R. at 367-68 (sought treatment for back pain after lifting a TV); R. at 374 (sought treatment for back pain after moving a dresser); R. at 377-78 (sought treatment for back and arm pain after lifting rocks); R. at 382 (sought treatment for back pain after helping someone move); R. at 397-98

(sought treatment for back pain after moving a refrigerator); Ex. 7F, R. at 509 (sought treatment for back pain after lifting heavy object); Ex. 13F, R. at 793 (reinjured back after moving furniture). The record also reflects that Martinez reported that he was able to do light chores, take care of his activities of daily living, and function independently. Ex. 8F, R. at 537.

Further, the ALJ's determination of Martinez's RFC correlates with Martinez's own claims, at the hearing and throughout the medical record, of his limitations because of his back pain, which shows that the ALJ did not discount Martinez's pain "to insignificance", but took it into serious consideration. The ALJ found that Martinez was physically limited to only occasionally balancing, bending, twisting, squatting, crawling, kneeling, and climbing; and must use a cane to ambulate. ALJ Decision, R. at 26. The record evidence reflects that those limitations are consistent with Martinez's claims, including that back pain increased with: prolonged movement (R. at 368, 511, 515, 539); bending (R. at 403, 505, 539, 637, 971, 979); lifting (R. at 45-46, 505, 971); twisting (R. at 637); prolonged walking (R. at 44-45, 539, 754, 759, 972); and prolonged sitting or standing (R. at 55).

The ALJ also discussed the medical records that reflect that Martinez's back impairment, and back pain, improved. ALJ Decision, R. at 28. Specifically, the ALJ referenced the multiple MRIs taken of Martinez's diskitis that showed improvement, and the physical therapy records and treatment notes that reflected improvement in back pain. *Id*. That determination is supported by substantial evidence in the record. *See* Ex. 3F, R. at 407 (pain much improved); Ex. 11F, R. at 651 (MRI shows complete resolution of discitis and osteomyelitis); Ex. 11F, R. at 673 (MRI displaying expected changes); Ex. 21F, R. at 976 (MRI showing improvement); Ex. 13F, R. at 723-50 (improvement with aquatherapy); Ex. 21F, R. at 2012 (MRI showing

improvement); Ex. 21F, R. at 972 (diskitis osteomyelitis resolved); Ex. 21F, R. at 969 (back pain 40% improved).

Accordingly, the ALJ's decision to discount Martinez's claims of pain was sufficiently clear and is supported by substantial evidence in the record and, therefore, remand is not warranted on this issue.

### D. Was the ALJ's Vocational Analysis Flawed?

Martinez also argues that the ALJ's vocational analysis was flawed. Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 11. Specifically, Martinez argues that the ALJ's finding at step five, that Martinez could adjust to other work, was made in error for two reasons: (1) the ALJ's hypothetical questions posed to Hall were flawed; and (2) Hall's testimony was erroneous. *Id*. at 11-19. I will address those issues one at a time.

#### 1. *Were the Hypothetical Questions Posed by the ALJ flawed?*

Martinez argues that the ALJ's hypothetical question to Hall "did not fairly incorporate [Martinez's] documented limitations" with respect to his back issues, his hand injuries, his need to nap daily. Mem. in Supp. Mot. to Reverse, Doc. No. 23-2 at 17-19. In response, the Commissioner argues that the ALJ need not "mirror a medical source statement" in his RFC determination, that the ALJ did rely on Dr. Khan's consultative report in determining how Martinez's limitations affected his RFC, and that there was no support in the record for Martinez's contentions that his hand injuries and need to nap affected his RFC. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 17-20.

If the ALJ asks a vocational expert a hypothetical question, in order for the expert's testimony "to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations … supported by the record." *Horbock v. Barnhart*, 210 F. Supp. 2d 125,

134 (D. Conn. 2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995)). If the ALJ "ask[s] the vocational expert a hypothetical question that fail[s] to include or otherwise implicitly account for all of [the claimant]'s impairments," then "the vocational expert's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion that [the claimant] c[an] perform significant numbers of jobs in the national economy." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011); *see also Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007) (unpublished) ("If the hypothetical question does not accurately portray Plaintiff's physical and mental state, [then] the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work"); *Medovich v. Colvin*, 2015 WL 1310310, at *14 (N.D.N.Y. Mar. 23, 2015) ("expert vocation testimony given in response to hypothetical questions that do not present the full extent of claimants' impairments, limitations[,] and restrictions … cannot constitute substantial evidence to support a conclusion of no disability"). In such circumstances, the ALJ's decision may be upheld only if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014); *cf. Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008).

Here, the ALJ fully described Martinez's RFC to Hall with respect to Martinez's physical limitations. First, as discussed above in section III(A), the ALJ's determination regarding Martinez's limitations stemming from his back impairments was supported by the record and, therefore, there was no need for him to provide a more limited assessment to Hall. Further, Martinez's medical record is wholly devoid of any note, assessment, or opinion that he needed to take daily naps. The only mention of napping in the record was Martinez's own testimony in

which he stated that he naps every day, usually "around 2:00 or 3:00 in the afternoon … anywhere from an hour to two hours." Tr. of ALJ Hr'g, R. at 58. Although Martinez may nap every day, there is nothing in the record to suggest that it was medically necessary and, therefore, such a limitation was not supported by the record. *Horbock*, 210 F. Supp. 2d at 134. The ALJ did not err in leaving daily napping out of the hypothetical posed to the ALJ.

Finally, the ALJ did not err in failing to include Martinez's hand impairments in the hypothetical posed to Hall. The medical records do reflect that Martinez had two notable hand injuries. In 2009, he had hand surgery for a laceration sustained while cutting wood laminate and a follow up shortly thereafter to remove a piece of laminate embedded in his hand. *See* St. Vincent's Med. Rec., Ex. 16F, R. at 863. In 2014, Martinez was hospitalized for over a month for an abscess on his right wrist, which caused swelling and pain. Bridgeport Hosp. Med. Rec., Ex. 11F, R. at 640-55. The medical record as a whole, however, does not indicate that Martinez suffered any lasting limitations from either injury. Further, the consultative examiner assessments, after reviewing the entire medical record, opine that Martinez had no manipulative limitations. Ex. 4A, R. at 116; Ex. 6A, R. at 141. Martinez's testimony that his hand hurt "every now and then" and the he "sometimes" dropped things (*see* Tr. of ALJ Hr'g, R. at 52-53, 59) was insufficient to support a limitation on the use of his hands, particularly in light of the record as a whole and Martinez's testimony that he was able to perform "fine motor" tasks. *Id*. at 59. Accordingly, the ALJ did not err in failing to include limitations on the use of Martinez's hands in the hypothetical to Hall.

2. *Was the Vocational Expert's Testimony Flawed?*

Martinez's next argument with respect to the ALJ's step five finding is that Hall's testimony about the availability of jobs was flawed because he relied on an incorrect

methodology and, therefore, the number of available jobs was inaccurate and "mathematically impossible". *Id*. at 11-17. In response, the Commissioner argues that Hall's testimony was sufficient to establish that there were jobs that Martinez could perform, and that there was no evidence to support Martinez's criticism of Hall's techniques and testimony. Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 21-24.

After a claimant has proved that his or her residual functional capacity precludes a return to "past relevant work," *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work in the national economy that the claimant can do." *Poupore*, 566 F.3d at 306. The ALJ may carry that burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151.

"[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *Id.* at 152. When a vocational expert's testimony is given "on the basis of the expert's professional experience and clinical judgment" and is not "undermined by any evidence in the record," he is "not required to articulate a more specific basis for his opinion," and an ALJ can "reasonably credit" the expert's testimony. *Id.* "Occupation evidence provided by a [vocational expert] … should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles] …. [A]s part of the [ALJ]'s duty to fully develop the record, the [ALJ] will inquire, on the record, as to wither or not there is such consistency." *Social Security Ruling 00-4p*, 2000 WL 1898704 (Dec. 4, 2000). ALJs "rely primarily" on the Dictionary of Occupational Titles in making disability determinations. *Id.*; 20 C.F.R. § 404.1566. The Dictionary of Occupational Titles ("DOT") is a publication by Department of Labor that "gives a job type a specific code … and establishes,

among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault*, 683 F.3d at 446.  The DOT provides information to the vocational expert, and ALJ, that is useful in determining "the type of work a disability applicant can perform." *Id.* "The DOT, however, just *defines* jobs.  It does not report how many such jobs are available in the economy." *Id.* (emphasis in original).  In order to provide information regarding the availability of the jobs listed in the DOT, the vocational expert must turn to other sources, such as the Occupational Employment Quarterly. *Id.*

District Courts in the Second Circuit "follow the 'Seventh Circuit['s] approach [of requiring some evidentiary basis to rely up[on] the opinions of the [vocational expert.]'" *Koutrakos v. Colvin*, 2015 WL 1190100, at *20 (D. Conn. Mar. 15, 2015) (citing *Wages v. Comm'r of Soc. Sec.*, 2013 WL 3243116, at *6 (D. Conn. June 26, 2013)).  An ALJ does not err when he relies on a vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available. *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013).  It is enough for a vocational expert to identify "'the sources he generally consulted to determine'" the availability of jobs, even if he does not provide "specific information." *Brault*, 683 F.3d at 450 (citing *Galiotti v. Astrue*, 266 F. App'x 66 (2d Cir. 2008) (summary order)).

Here, Hall testified regarding the type of jobs that Martinez was capable of holding, given his physical and mental limitations, as posted by the ALJ in the hypothetical questions.  Tr. of ALJ Hr'g, R. at 64-66.  He testified that he referenced the DOT in compiling the list of jobs and that his testimony was "consistent with" the DOT. *Id.* at 66.  He then went on to specify the number of available jobs, both locally and nationally, for each listed position. *Id.* at 64-66.  He did not, however, identify any other publications or sources that he used in coming to such a

determination. *Id.* He mentioned only the DOT which simply defines jobs, and does not provide information regarding the number of available positions. *Brault*, 683 F.3d at 446. Indeed, the Commissioner concedes that Hall "did not provide his source for his numbers and did not explain this method of analysis of the job data." Mem. in Supp. Mot. to Affirm, Doc. No. 24-1 at 23. By failing to identify any sources that he consulted, even generally, in determining the availability of jobs, Hall's testimony did not comport with the Second Circuit's standard. *See Brault*, 683 F.3d at 450. Hall did not cite a single other source upon which he could have relied, and the ALJ did not ask him how he came to his conclusions. The ALJ merely asked if his opinion was consistent with the DOT; Tr. of ALJ Hr'g, R. at 66; which may be a sufficient basis for a vocational expert's opinion regarding the *types* of jobs available to Martinez, but not regarding the *number*. The ALJ's determination that Hall "identified the sources he used in addition to his personal experience in determining the numbers" was erroneous. ALJ Decision, R. at 30. Accordingly, Hall's testimony was inadequate.

Of course, "agency errors do not always warrant remand," and in a different context, the Second Circuit has held that remand of an administrative appeal is "futile (a) when the [ALJ] articulates an alternative and sufficient basis for [his] determination; (b) when [his] reliance on the erroneous aspect of [his] reasoning is substantially tangential to [his] non-erroneous findings; or (c) when overwhelming evidence in the record makes it clear that the same decision is inevitable." *Zhong v. U.S. Dept' of Justice*, 480 F.3d 104, 117 (2d Cir. 2006); *see also McIntyre*, 758 F.3d at 148 (applying harmless error analysis to Social Security appeal). None of those exceptions apply here. The ALJ explicitly stated that he relied on the vocational expert's testimony regarding the available number of jobs in the local and national economy in deciding whether there were sufficient jobs in the national economy that Martinez would be able to

perform. Tr. of ALJ Hr'g, R. at 30. Far from the ALJ "articulat[ing] an alternative and sufficient basis for [his] determination," or "overwhelming evidence in the record mak[ing] it clear that the same decision is inevitable," *Zhong*, 480 F.3d at 117, the vocational expert's inadequate testimony was the only evidence in the record that supported the ALJ's findings that there were jobs that Martinez could perform that existed in sufficient numbers in the national economy. ALJ Decision, R. at 30. Further, the ALJ's error was not "tangential." *Zhong*, 480 F.3d at 117. The mistake was essential to the ALJ's finding that Martinez was "not disabled" because there was other work that he could perform that existed "in significant numbers in the national economy," ALJ Decision, R. at 30—a step of the disability determination on which the Commissioner bore the burden of proof. *See Poupore*, 566 F.3d at 306.

The ALJ's finding that Martinez had available to him a significant number of jobs that he could perform is not supported by the record. To the contrary, the ALJ's conclusion was supported only by the opinion of the vocational expert, given with no reference to any supporting sources. Because no other evidence supports the ALJ's determination with regard to the number of jobs available to Martinez, his finding of "not disabled" is "not supported by substantial evidence in the record," and must be remanded. *See Greek*, 802 F.3d at 374-75.

## IV.     Conclusion

For the reasons set forth above, Martinez's Motion to Reverse the Decision of the Commissioner (Doc. No. 23) is **granted**, and the Commissioner's Motion to Affirm its Decision (Doc. No. 24) is **denied**. The case is remanded for further articulation and development of the ALJ's determination at steps three and five.

The Clerk shall enter judgment, effect remand to the Commissioner, and close the case. In the event of a subsequent appeal, the clerk's office is directed to assign the appeal to my docket.

So ordered.

Dated at Bridgeport, Connecticut, this 14th day of March 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge